In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Ricky Dean's, Inc., d/b/a The Sandbar; Rita "Peach" Madl.** | Civil Action No. 5:20-cv-04063 – DDC-ADM |
| Plaintiffs, | Memorandum in Support of Motion for Preliminary Injunction |
| v. | |
| **Thomas Marcellino, M.D.,** in his official capacity as the Lawrence-Douglas County, Kansas, Local Health Officer; **John Doe 1-20**; **Doe Entities 1-20.** | |
| Defendants. | |

**Memorandum in Support of Motion for Preliminary Injunction**

**Table of Contents**

Introduction ..................................................................................................................1

1.   Statement of the Nature of the Matter.......................................................... 2

2.   Statement of Facts......................................................................................... 2

3.   Question Presented .......................................................................................5

4.   Argument ......................................................................................................5

    4.1.   Preliminary Injunction Standard ......................................................7

    4.2.   The Injunction Should Issue Because All of the Factors Favor Plaintiffs. None of the Factors Favor the Defendant....................................................7

        4.2.1.   Plaintiffs are Likely to Succeed on the Merits Because the Order Does Not Afford Procedural Due Process of Any Kind.................................. 8

            4.2.1.1.   The Order Impacts "Liberty" and "Property" Interests.  9

            4.2.1.2.   The Order Constitutes a "Deprivation" in the Due Process Sense. ...................................................................................14

            4.2.1.3.   The Order is Not Legislative and the Rationale for Dispensing With Procedural Due Process Does Not Hold Up. ...................................................................................16

            4.2.1.4.   The Lack of *Any* Hearing Process Violates Due Process..18

            4.2.1.5.   *Jacobson v. Massachusetts* Cannot Be Read to Dispense with Procedural Due Process. .................................................. 20

            4.2.1.6.   Issues Not Raised During the Motion for Preliminary Injunction are Preserved and Not Waived...................... 22

    4.3.   Plaintiffs will Suffer Irreparable Harm ............................................23

    4.4.   Balance of Equities and the Public's Interest Favor an Injunction...................23

5.   Security Bond Should Not Be Required........................................................ 24

6.   Conclusion ................................................................................................. 24

## Table of Authorities

### Cases

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ................................................................................. 8

*Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564 (1972) ...................................................... 9

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441 (1915) ...................................... 17

*Bolling v. Sharpe*, 347 U.S. 497 (1954) ...................................................................................... 10

*Brookpark Entm't, Inc. v. Taft*, 951 F.2d 710 (6th Cir. 1991) ...................................................... 12

*Buck v. Bell*, 274 U.S. 200 (1927) ............................................................................................... 21

*Cty. of Butler v. Wolf*, No. 2:20-CV-677, 2020 WL 5510690 (W.D. Pa. Sept. 14, 2020) ......... 21

*Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002) ....................................................................... 24

*First Baptist Church v. Kelly*, 2020 WL 1910021 (D. Kan. Apr. 18, 2020) ............................... 20

*Fish v. Kobach*, 189 F.Supp.3d 1107 (2016) ............................................................................... 24

*Frazier v. City of Saint George*, 268 P.3d 12 (Kan. Ct. App. 2012) ........................................... 13

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ................................................................................ passim

*Gilbert v. Homar*, 520 U.S. 924 (1997) ...................................................................................... 18

*Harjo v. City of Albuquerque*, 307 F. Supp. 3d 1163, (D.N.M.), modified on reconsideration, 326

    F. Supp. 3d 1145 (D.N.M. 2018) ......................................................................................... 9

*Harjo v. City of Albuquerque*, 326 F. Supp. 3d 1145 (D.N.M. 2018) ......................................... 10

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) ....................................... 24

*In re Disc Heat, LLC*, No. 13-10568, 2013 WL 6080183 (Bankr. D. Kan. Nov. 18, 2013) ....... 12

*Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905) ............................................. 20

*Jew Ho v. Williamson*, 103 F. 10 (C.C.N.D. Cal. 1900) ............................................................... 6

*Joelner v. Village of Washington Park, Illinois*, 378 F.3d 613 (7th Cir.2004) ........................... 23

*Johnson v. Morales*, 946 F.3d 911 (6th Cir. 2020) .............................................................. 10, 11

*Jorgensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003) ................................................................. 24

*Kelly v. Legislative Coordinating Council*, 311 Kan. 339 (2020) .................................................7

*Korematsu v. United States*, 323 U.S. 214 (1944) ........................................................................ 6

*Lentsch v. Marshall*, 741 F.2d 301 (10th Cir. 1984)....................................................................10

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ............................................................ 9, 19

*Loudermill v. Cleveland Bd. of Educ.*, 470 U.S. 532 (1985)........................................................ 8

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ......................................................................... 18, 19

*Microtronics, Inc. v. City of Iola, KS*, No. 03-1159-WEB, 2003 WL 22149671, at *6 (D. Kan. Sept. 9, 2003) ........................................................................................................................... 11

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ................................................................................. 22

*National People's Action v. Village of Wilmette*, 914 F.2d 1008 (7th Cir. 1990) ........................23

*Onyx Properties LLC v. Bd. of Cty. Commissioners of Elbert Cty.*, 838 F.3d 1039 (10th Cir. 2016) ........................................................................................................................................ 17

*Reed v. Vill. of Shorewood*, 704 F.2d 943 (7th Cir. 1983) .........................................................14

*Save our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2004) ........................................... 24

*Schenck v. United States*, 249 US 47 (1919) ................................................................................ 6

*Stidham v. Peace Officer Standards And Training*, 265 F.3d 1144 (10th Cir. 2001) .......10, 11, 14

*Tanasse v. City of St. George*, 172 F.3d 63 (10th Cir. 1999) ..................................................... 11

*Texans for Free Enterprise v. Texas Ethics Com'n*, 732 F.3d 535 (5th Cir. 2013) ...................... 24

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351 (10th Cir. 1986) ..........................................................................................................................23

*Truax v. Raich*, 239 U.S. 33 (1915) ............................................................................................ 9

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) .................................................................................. 6

*United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464 (6th Cir. 2014) ................19

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) ..........................................18

*Verlo v. Martinez*, 820 F.3d 1113 (10th Cir. 2016) ......................................................................7

*Ward v. Anderson*, 494 F.3d 929 (10th Cir. 2007)....................................................................10

*Wise v. Bravo*, 666 F.2d 1328 (10th Cir. 1981)........................................................................10

**Statutes**

KSA § 41-2609..............................................................................................................................13

KSA § 41-2629..............................................................................................................................12

KSA § 41-2642................................................................................................................................3

KSA § 41-326 ........................................................................................................12

KSA § 65-119 ........................................................................................................ 2

KSA § 65-127 ........................................................................................................ 2

KSA § 65-129b ...................................................................................................2, 3

KSA § 65-202 ........................................................................................................ 2

KSA § 65-619 ........................................................................................................3

### Constitutional Provisions

U.S. Const. amend. XIV ........................................................................................ 8

**Introduction**

COVID-19 is serious. It has caused physical, emotional, and financial havoc in Kansas and elsewhere.

In March 2020, Defendant Marcellino began issuing a series of emergency health orders which culminated in the latest iteration of a restaurant and bar curfew regime. The Order requires restaurants and bars with liquor licenses to stop serving alcohol at 11:00 p.m. and to close at 12:00 a.m., regardless of the bar's COVID-19 mitigation procedures and protocols. The Order prohibits a bar from utilizing *outdoor* seating areas after midnight but permits *indoor* restaurants without a liquor license to remain open after midnight. Curbside sales of food are permitted after 11:00 p.m., but curbside sales of alcohol are not.

Peach Madl and The Sandbar are not asking this Court to declare it safe enough to operate. They are not asking this Court to wade into epidemiology, or statistics, or consider scientific or technical data about disease transmission.

Instead, Ms. Madl and The Sandbar's ask is simple and should be uncontroversial: apply the Fourteenth Amendment's procedural due process guarantee to local health orders. In other words, they are asking for the opportunity to be heard, promptly, in a meaningful manner.[1]  To be clear, Ms. Madl and The Sandbar are *not* asking this court to create the due process procedures or to hold due process hearings. Rather, they are simply asking this Court to find that procedural due process applies.

_____

[1] Plaintiffs are not waiving their other claims, and in fact are preserving their other claims. See section below for further preservation language.

1.      **Statement of the Nature of the Matter**

Peach Madl and The Sandbar seek relief from the county-wide emergency Order issued by Dr. Marcellino on the grounds the Order violates the Fourteenth Amendment's procedural due process guarantee. The Order does not provide a pre- or post-deprivation hearing of any kind.

2.      **Statement of Facts[2]**

Local Health Officer Dr. Marcellino is charged with "exercise[ing] and maintain[ing] a supervision" over infections or contagious disease cases and charged with "seeing that all such cases are properly cared for[.]" KSA § 65-119(a).

Dr. Marcellino has the statutory power to "prohibit public gatherings" (KSA § 65-119), "use all known measures" (KSA § 65-202), and "isolate" (KSA § 65-129b) or "quarantine" (KSA § 65-129b) individuals. An order "prohibit[ing] public gatherings" is statutorily enforceable (KSA § 65-127) ("Any person found guilty of violating any of the provisions of K.S.A. 65-118, 65-119, 65-122, 65-123 and 65-126, and any amendments thereto, or failing to comply with any requirements thereof shall be fined, upon conviction, not less than twenty-five dollars ($25) nor more than one hundred dollars ($100) for each offense."), but an "all known measures" order is not enforceable. See *id*. Neither phrase, "prohibit public gatherings" or "use all known measures" is statutorily defined.

---

[2] All factual assertions are taken from the Verified Amended Complaint and Exhibits (Doc. 13), which are incorporated here as if set forth fully, except where noted.

2

Dr. Marcellino, in his official capacity as the Local Health Officer, has issued a variety and series of emergency orders throughout the COVID-19 pandemic, none of which have included a pre- or post-deprivation hearing process of any kind.

On October 1, 2020, Dr. Marcellino, in his official capacity as the Local Health Officer, issued the Emergency Public Order ("Order") specifically at issue in this case. (Doc. 13-1.) The Order's restaurant and bar curfew regime,[3] in part:

> c. In addition to subsection (a) and (b), restaurants and bars with liquor licenses are required to cease serving alcohol at 11:00 pm and shall close their premises, including all outside seating areas or patios, to customers no later than 12:00 am/midnight. Restaurants and bars serving alcohol may conduct carry-out, curbside and off-premises delivery <u>of food</u> items after 11:00 pm. There shall be no carry-out, curbside or off-premises delivery <u>of alcoholic beverages</u> after 11:00 pm. Restaurants that do not serve alcohol are not required to close at 12:00 am/midnight.

The Order remains in effect "until rescinded or until modified." (Doc. 13-1.) According to the Order itself, Dr. Marcellino issued the Order pursuant to "K.S.A. 65-119 and KSA § 65-129b and other applicable laws or regulations." (Doc. 13-1). KSA § 65-129b is the state's quarantine statute.

### The Sandbar and Rita "Peach" Madl

Ricky Dean's, Inc., is a Kansas for profit corporation formed in 1989. Ricky Dean's Inc. does business as The Sandbar. Ricky Dean's, Inc., d/b/a The Sandbar, holds a Food Establishment License pursuant to KSA § 65-619, et. seq., and a Drinking Establishment License pursuant to KSA § 41-2642.

---

[3] The restaurant and bar curfew regime is shorthand for the "business restrictions" in paragraphs 4.c., 4.c.3., 4.c.4., 4.c.5., and to the extent appliable to Plaintiffs, 4.d, 4.d.1, 4.d.2, 4.d.3, 4.d.5, 4.d.6 and 4.d.7.

The Drinking Establishment license allows Ricky Dean's Inc., d/b/a The Sandbar (The Sandbar) to, among other things, "sell and serve alcoholic liquor for consumption on licensed premises; serve free samples of alcoholic liquor; redeem drink coupons in arrangement with a hotel; and other activities so authorized in K.S.A. 41-2642."

The Food Establishment License grants The Sandbar, among other things, the "[a]uthority to operate as a Food Establishment" under the Kansas Food, Drug and Cosmetic Act.

Rita "Peach" Madl is, according to the annual report, the president or equivalent of Ricky Dean's, Inc., which does business as The Sandbar.

The Sandbar promotes itself as "inspired by the free-spirited lifestyle of Key West and the music of Jimmy Buffet, the Sandbar is a tiny oasis for people from all walks of life. From University of Kansas students and returning alumni to local business people to tourists, the Sandbar's tiki-bar atmosphere has something for everyone." Despite its "free-spirited" nature, The Sandbar has put in place serious COVID-19 mitigation procedures and protocols.

   

The Sandbar and Ms. Madl have been and continue to be injured by the restaurant and bar curfew regime. Among other things, The Sandbar must cease certain commercial activity at 11:00 p.m.; physically close its business to customers at 12:00 a.m.; and is prohibited from

offering curbside or "to-go" sales after 11:00 p.m. This restaurant and bar curfew regime contravenes state and city law in many ways, but as an example, The Sandbar would not otherwise be prohibited from serving alcoholic beverages from 6:00 a.m. to 2:00 a.m., (*See* KSA § 41-2614) or offering curbside sales during normal hours. *See ex.* Doc. 13-11 (Kansas Department of Revenue Memorandum, "RE: COVID-19 Concerns Regarding Sales on the Licensed Premises" (March 18, 2020).

### 3.    Question Presented

Plaintiffs raise only one question at this preliminary stage.[4] Stated generally, when a local health officer unilaterally creates a bar and restaurant curfew regime requiring businesses to physically close their doors earlier than state law requires, stop commercial activity earlier than state law permits, and orders the cessation of "to-go" sales at arbitrary times, all of which negatively impacts Plaintiffs, without any pre- or post-deprivation hearing process of any kind, is procedural due process violated? In other words, are Plaintiffs entitled to a due process hearing?

### 4.    Argument

Procedural due process exists for a reason: to protect life, liberty, and property from arbitrary government action. It serves as a modest check on the government's power and is concerned with procedural fairness, as opposed to substantive fairness. The concept is simple

---

[4] Plaintiffs are not waiving their other claims.

but deeply important. If the government deprives its citizens of life, liberty, and property, were the procedures utilized fair?

Without procedural due process, the government is given nearly free reign to do as it immediately pleases. Procedural due process is perhaps even more important during a pandemic because it ensures the government does not act too hastily, or veer too far off course, in the name of an emergency. History is replete with such examples.

In the late 1890s, children were forcibly separated from their parents and exiled in Kalaupapa, a remote section of Molokai, Hawai'i, because of Hansen's disease.[5] It took nearly 70 years before the isolation laws changed.[6] In 1900, officials in Honolulu burned to the ground buildings where the bubonic plague was thought to exist.[7] In San Francisco, a quarantine order was "made to operate against the Chinese population only[.]" *Jew Ho v. Williamson*, 103 F. 10, 23 (C.C.N.D. Cal. 1900). In 1919, a crisis justified the incarceration of pamphleteers. *Schenck v. United States*, 249 US 47 (1919). Some of emergency decisions have had long lasting, negative effects. It took the Supreme Court almost 75 years to expressly overturn *Korematsu v. United States*, 323 U.S. 214 (1944), for example. See *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018).

There is no doubt COVID-19 is serious, vigilance is paramount, and *this* case is **not** approaching the levels above, thankfully. But the general point remains: a pandemic is no reason to ignore the constitution, even when a local health officer's intent is noble. As one

---

[5] https://www.civilbeat.org/2011/07/12168-a-lost-child-of-kalaupapa/
[6] https://www.cnn.com/2015/09/09/health/leprosy-kalaupapa-hawaii/index.html
[7] https://www.hawaiinewsnow.com/story/5080433/the-black-plague-of-1900/

Kansas Supreme Court justice said, "[w]ithout a doubt, everyone involved has been putting forth an extraordinary effort to keep Kansans safe in unprecedented times. And certainly everyone involved is a dedicated public servant with the best intentions to perform his or her duties to the best of their abilities for the benefit of us all. Nonetheless, public officials have an ongoing duty to adhere to the law. This duty doesn't evaporate in a crisis—in fact, a crisis may heighten the duty." *Kelly v. Legislative Coordinating Council*, 311 Kan. 339, 356 (2020) (Stegall, J. concurring).

The same applies here. When a health officer issues an order, those affected should have the right to due process hearing, promptly and meaningfully. A due process hearing would *still* allow the government to act quickly to address public health concerns while simultaneously minimizing the impact on constitutional liberties. Everyone wins.

### 4.1.    Preliminary Injunction Standard

A court should issue a preliminary injunction if the movant demonstrates: (1) a likelihood of success on the merits; (2) a likelihood the movant will suffer irreparable harm if the injunction is not issued; (3) the balance of the equities tip in the movant's favor; and (4) that the grant of the injunction is in the public's interest. *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (quoting *Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013).

### 4.2.    The Injunction Should Issue Because All of the Factors Favor Plaintiffs. None of the Factors Favor the Defendant.

It is clear beyond any doubt that the Order itself does not afford a due process hearing of any kind. Plaintiffs are likely to succeed on the merits and every remaining element favors issuing injunctive relief.

### 4.2.1. Plaintiffs are Likely to Succeed on the Merits Because the Order Does Not Afford Procedural Due Process of Any Kind.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall … deprive any person of life, liberty, or property without due process of law[.]" U.S. Const. amend. XIV.

The keystone of procedural due process is notice and an opportunity to be heard in a meaningful time, in a meaningful manner. *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard[.] … It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.") (cleaned up); s*ee also Loudermill v. Cleveland Bd. of Educ.*, 470 U.S. 532 (1985); *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (Due process requires an "opportunity which must be granted at a meaningful time and in a meaningful manner.").

The "right to be heard" is "a basic aspect of the duty of government to follow a fair process of decisionmaking." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). Its "purpose … is to ensure abstract fair play to the individual … and to protect his use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property[.]" *Id.* at 80-81 (cleaned up). "[T]he prohibition against the deprivation of property without due process of law reflects the high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of governmental interference." *Fuentes* at 81. (1972) (cleaned up).

The Supreme Court's "decisions have emphasized time and again, the Due Process Clause grants the aggrieved party the opportunity to present his case and have its merits fairly judged. Thus it has become a truism that '*some* form of hearing' is required[.]" *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982) (italics in original).

Therefore, "[p]rocedural due process has a two-step inquiry: (i) is there a protected liberty or property interest; and (ii) has the government provided an appropriate level of process to protect that interest." *Harjo v. City of Albuquerque*, 307 F. Supp. 3d 1163, 1210 (D.N.M.), modified on reconsideration, 326 F. Supp. 3d 1145 (D.N.M. 2018).

### 4.2.1.1.    The Order Impacts "Liberty" and "Property" Interests.

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." *Harjo v. City of Albuquerque*, 326 F. Supp. 3d 1145, 1185 (D.N.M. 2018) (cleaned up).

"In a Constitution for a free people, there can be no doubt that the meaning of liberty must be broad indeed." *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 572 (1972) (cleaned up). "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Truax v. Raich*, 239 U.S. 33, 41 (1915).

A liberty interest includes "the right of the individual to contract, to engage in any of the common occupations of life ... and generally to enjoy those privileges long recognized ... as essential to the ordinary pursuit of happiness by free men." *Bd. of Regents* at 572, (quoting

*Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). "Liberty under law extends to the full range of conduct which the individual is free to pursue[.]" *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

The right to earn a living is a protected "liberty" interest worthy of procedural due process. *Stidham v. Peace Officer Standards And Training*, 265 F.3d 1144, 1153 (10th Cir. 2001) (The "right to enjoy employment opportunities in his chosen field—has been repeatedly upheld in the courts); *Lentsch v. Marshall*, 741 F.2d 301, 303 (10th Cir. 1984) ("The liberty interest that due process protects includes the individual's freedom to earn a living."); *Ward v. Anderson*, 494 F.3d 929, 935 (10th Cir. 2007) (Interest in health and success of business "self-evident."). *Wise v. Bravo*, 666 F.2d 1328, 1336 (10th Cir. 1981) (Seymour, J. concurring) ("Like the right to marry and have children and the right to live where one wants and pursue a livelihood by any lawful means, this right constitutes a "liberty" interest. As such it is protected by the due process clause of the Constitution."); *Johnson v. Morales*, 946 F.3d 911, 921 (6th Cir. 2020) ("Johnson's interest in her business license is enough to invoke due process protection."). Given the purpose of procedural due process, to protect liberty, Plaintiffs' interests are more than sufficient to trigger constitutional protections.

The Order also impacts Plaintiffs' property interests. "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These property interests, as already explained, clearly can include real estate, chattels, or money, but they may take many forms." *Harjo v. City of Albuquerque*, 326 F. Supp. 3d 1145, 1186 (D.N.M. 2018) (cleaned up).

"The prohibition against the deprivation of property without due process of law reflects the high value, embedded in our constitutional and political history, that we place on a person's

right to enjoy what is his, free of governmental interference." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972) (cleaned up).

"The Supreme Court has held that a license to practice one's calling or profession is a protected property right. *See Bell v. Burson*, 402 U.S. 535, 539 (1971)." *Stidham v. Peace Officer Standards And Training*, 265 F.3d 1144, 1149–50 (10th Cir. 2001). "Expanding upon *Bell*, Justice Brennan subsequently declared that "[w]hat was said of automobile drivers' licenses in *Bell v. Burson* ... is even more true of occupational licenses." *Stidham* at 1150 (10th Cir. 2001). "This court has previously suggested that in some circumstances Forest Service permits, once issued, may warrant such constitutional protection, as well as licenses to sell beer[.] Thus, the revocation or removal of a license or certificate that is "essential in the pursuit of a livelihood" requires procedural due process under the Fourteenth Amendment." *Id*.

In short, a license to "practice one's calling or profession is a protected property right" for due process purposes. *Stidham v. Peace Officer Standards And Training*, 265 F.3d 1144, 1149–50 (10th Cir. 2001); *see also Tanasse v. City of St. George*, 172 F.3d 63 (10th Cir. 1999) (unpublished) (A business interest and a liquor license is sufficient to invoke due process protection.). *Microtronics, Inc. v. City of Iola, KS*, No. 03-1159-WEB, 2003 WL 22149671, at *6 (D. Kan. Sept. 9, 2003) ("Plaintiff's real estate and business operations were undoubtedly property interests [in the due process context.]"); *Johnson v. Morales*, 946 F.3d 911, 921 (6th Cir. 2020) ("Johnson's interest in her business license is enough to invoke due process protection.").

Defendant might attempt to minimize Plaintiffs' interests by arguing a liquor license is not a protected "property" interest for bankruptcy purposes, and therefore, procedural due

process does not attach to the instant matter. *See In re Disc Heat, LLC*, No. 13-10568, 2013 WL 6080183, at *2 (Bankr. D. Kan. Nov. 18, 2013). There, the debtor requested the bankruptcy court enjoin the State of Kansas from proceeding with their already initiated state administrative revocation in state court. The court held that "a Kansas liquor license is not a property interest" and relied on KSA § 41-326: "A [liquor] license shall be purely a personal privilege, … and shall not constitute property[.]"

The government raised a similar argument in *Brookpark Entm't, Inc. v. Taft*, 951 F.2d 710, 714 (6th Cir. 1991), superseded by statute:

> "The district court stated, and the defendants argue on appeal, that an Ohio liquor license is not property within the meaning of the Due Process Clause. The due process clause only protects those interests to which one has a 'legitimate claim of entitlement.' This has been defined to include 'any significant property interests, including statutory entitlements.' … 'Government licenses are … a form of property insofar as they constitute an entitlement to engage in a valuable activity.' … An individual having 'present enjoyment of the benefit and a claim of entitlement to its continuation under state law … has a property interest which is protected by the due process clause.'

> "Although the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) (citations omitted). The license may rise to the level of property under the Due Process Clause even though Ohio chooses not to call it property. "[W]e must look behind labels, and decide whether the plaintiffs' license was 'property' in a functional sense." *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir.1983) (citations omitted). In short, we look to Ohio law to determine the nature of the interest, not the label to apply to it."

Looking "beyond the labels" so to speak, a Kansas drinking establishment license is not subject to attachment, is not alienable or transferable, and is not subject to being encumbered. KSA § 41-2629. This cuts against it being considered classically "property."

On the other hand, and more importantly, a drinking establishment license has significant pecuniary value because it enables the holder to operate an establishment that serves alcoholic beverages, and to conduct commercial transactions from 6:00 a.m. to 2:00 a.m. In other words, the license allows Plaintiffs to operate until 2:00 a.m., and Plaintiffs had the legitimate expectation they would be allowed to fully operate until 2:00 a.m. Further, the legislature clearly acknowledges that due process rights exist for current license holders, after all, they have a right to notice and hearings for adverse actions. *See* KSA § 41-2609 ("No license shall be suspended, involuntarily cancelled or revoked unless there is an opportunity for a hearing before the director."). And, over time, such as here, a license may become a property interest. *Frazier v. City of Saint George*, 268 P.3d 12 (Kan. Ct. App. 2012) (unpublished) ("Frazier had a protected interest that developed over time through the City's acquiescence in the operation of her class B club, as evidenced by the City's acceptance of fees from her in accordance with City Code § 3–302."). Further, the statutory scheme entitles license holders to physically use their property to sell alcohol from 6:00 a.m. to 2:00 a.m.  So, while a drinking establishment might not be a property interest for bankruptcy purposes, it *is* a property interest for procedural due process purposes. When viewed as a whole, the Drinking Establishment license, and business interest, which would otherwise allow Plaintiffs to operate and conduct commercial transaction until 2:00 a.m., constitutes a protected property right for procedural due process purposes.

The drinking establishment license is not the only "property" interest at play. The Order prohibits The Sandbar from using their outdoor and indoor property after midnight, and

prevents The Sandbar from utilizing its property to offer to-go sales of alcohol, despite state law which would otherwise permit both.

On balance, the Order impacts a busines operation, impacts the ability to earn a living, and coupled with the interests in the drinking establishment and food establishment licenses, is enough to trigger procedural due process guarantees.

### 4.2.1.2.   The Order Constitutes a "Deprivation" in the Due Process Sense.

There is no doubt that an order entirely closing a business, or an order completely revoking a license would be considered a "deprivation" in the due process sense. It is true the Order does neither. It is equally true that it is "well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment." *Fuentes v. Shevin*, 407 U.S. 67, 84–85. (1972). Deprivation in the due process sense does *not* "mean 'destroy.' If the [government] prevents you from entering your house it deprives you of your property right even if the fee simple remains securely yours. A property right is not bare title, but the right of exclusive use and enjoyment. [Here] the plaintiffs were deprived of their property right in the [liquor] license even though the license was never actually revoked." *Reed v. Vill. of Shorewood*, 704 F.2d 943 (7th Cir. 1983), overruled on other grounds.

Further, "[t]he deprivation of a constitutional right does not depend on form. We must look at the substance of the actions taken relative to a constitutionally protected right." *Stidham v. Peace Officer Standards And Training*, 265 F.3d 1144, 1152 (10th Cir. 2001) (quoting *Westborough Mall, Inc. v. City of Cape Girardeau*, 794 F.2d 330 (8th Cir.1986)).

"[The government] cannot escape liability for depriving an individual of a legitimate property interest merely by arguing that it has not revoked or destroyed the actual legal title to that interest." *Stidham v. Peace Officer Standards And Training*, 265 F.3d 1144, 1153 (10th Cir. 2001)

Under the totality of the circumstances, the "deprivation" began on March 18, 2020, and has continued, with only limited exceptions, since then. *See*

> (Doc. 13-2) (March 18, 2020 Order: "All restaurants, dining facilities, bars, taverns, clubs and movie theatres in Douglas County, Kansas are hereby ordered closed to the public effective 12:01 a.m. on March 19, 2020 until 12:01 a.m. on April 1, 2020[.]")

> (Doc. 13-3) (May 26, 2020 Order: "The following, unless they are repurposed for use in an essential function under the KEFF … shall be closed to the public: [b]ars and night clubs, excluding already operating curbside and carryout services."),

> (Doc. 13-5) (July 2, 2020 Order: "The following, unless they are repurposed for use in an essential function … shall be closed to the public: [b]ars and night clubs, excluding already operating curbside and carryout services."),

> (Doc. 13-6) (Sept. 4, 2020 Order: "[R]estaurants and bars with liquor licenses are required to cease serving alcohol at 9:00 pm and shall close their premises, including all outside seating areas or patios, to customers no later than 10:00 pm. … There shall be no carry-out, curbside or off-premises delivery of alcoholic beverages after 9:00 pm. Restaurants that do not serve alcohol are not required to close at 10:00 p.m.) (underline in original),

> (Doc. 13-1) (Oct. 1, 2020 Order: "[R]estaurants and bars with liquor licenses are required to cease serving alcohol at 11:00 pm and shall close their premises, including all outside seating areas or patios, to customers no later than 12:00 am/midnight. … There shall be no carry-out, curbside or off-premises delivery of alcoholic beverages after 11:00 pm. Restaurants that do not serve alcohol are not required to close at 12:00 am/midnight.") (underline in original).

The Order's restaurant and bar curfew regime deprives Peach and the Sandbar from 1) fully utilizing their property until 2:00 a.m. as they have in the past, 2) fully conducting commercial transactions as the state law regarding hours permits, as they have done so in the

past; 3) fully conducting "to-go" sales as they are otherwise allowed to do so, and from 4) fully utilizing their outdoor seating consistent with state and city law, as they have in the past. The Order's restaurant and bar curfew regime deprives Ms. Madl and The Sandbar of their 5) liberty and property interests in connection with their business operations and/or the rights to earn livings, coupled with their interests in their licenses. But for the Order, Plaintiffs would remain open until 2:00 a.m., would conduct commercial transactions to the fullest extent possible under the law, would fully utilize their property, including outdoor seating, and would conduct to-go sales. The order has and continues to deprive Plaintiffs of their customers. In fact, the Order's entire intent and purpose is to literally limit Plaintiffs' ability to utilize their property, make commercial transaction, and fully utilize their licenses to the fullest extent possible. This can hardly be characterized as anything other than a deprivation.

This Order constitutes a "deprivation" in the same sense it would be a deprivation if the Order prohibited insurance defense attorneys from billing hours after 8:00 p.m., or prohibited breakfast diners from opening only after 2:00 p.m., or prohibited barbers from cutting hair on the weekends, or only permitted coffee shops to conduct coffee sales between 6:00 p.m. and midnight. In each of those examples, it is beyond reproach a deprivation has occurred, just as it is beyond reproach Plaintiffs have suffered a deprivation because the restaurant and bar curfew regime.

        4.2.1.3.      **The Order is Not Legislative and the Rationale for Dispensing with Procedural Due Process Does Not Hold Up.**

Defendant might argue procedural due process should not apply because, in their view, the Order should be characterized as legislative. In *Bi-Metallic Inv. Co. v. State Bd. of*

*Equalization*, 239 U.S. 441, 445 (1915), the Court held that "general statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule." The rationale for dispensing with procedural due process is premised on the "general theory of republican government" that procedural fairness may be accomplished "through elective representation, partisan politics, and the ultimate sovereignty of the people to vote out of office those legislators who are unfaithful to the public will." *Onyx Properties LLC v. Bd. of Cty. Commissioners of Elbert Cty.*, 838 F.3d 1039, 1045 (10th Cir. 2016) (cleaned up). But when "political remedies are often unattainable by individuals or small groups" for example, the "need for additional procedural protections is greater[.]" *Id.* (cleaned up).

In this instance, the *Bi-Metallic* rationale for dispensing with procedural due process simply does not hold up. First, this is not a "general statute" subject to the political process. It is an order by fiat, insulated by any kind of real citizen participation. Second, Ms. Madl and The Sandbar's rights are not protected by "their power, immediate or remote, over those who make the rule" and they cannot accomplish "procedural fairness" through "elective representation" or "partisan politics" or through "vot[ing]." Dr. Marcellino is not politically accountable whatsoever. He was hired by the Lawrence-Douglas Health Board, which was in turn appointed by the Douglas County Commission, the Lawrence City Commission, and the Chancellor of the University of Kansas. There is no political remedy to be had.

### 4.2.1.4.   The Lack of *Any* Hearing Process Violates Due Process.

This Court is not tasked with deciding whether Plaintiffs are safe enough to operate or to determine what a due process hearing constitutes.  Instead, this Court simply needs to decide whether the lack of *any* hearing process of *any* kind violates due process. It does.

Procedural due process is based on the concept of fundamental fairness. *See Fuentes v. Shevin*, 407 U.S. 67, 81 (1972). Fairness can "rarely be contained by [a] secret, one-sided determination of facts." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972) (cleaned up). There is "no better instrument" than procedural due process to "arrive[] at [the] truth." *Id.* (cleaned up).

In some limited instances, the government might be able to dispense with a pre-deprivation hearing. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) ("We tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only in extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.") (cleaned up); *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). But those instances must be "extraordinary" and "truly unusual." *Fuentes v. Shevin*, 407 U.S. 67, 91 (1972).

Again, a *pre*-deprivation hearing in March, when COVID-19 first surfaced, might have not been required. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (Pre-deprivation hearing process not required after considering "the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and

administrative burdens that the additional or substitute procedural requirement would entail.").

But procedural due process nonetheless requires ***some*** process. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982) ("As our decisions have emphasized time and again, the Due Process Clause grants the aggrieved party the opportunity to present his case and have its merits fairly judged. Thus it has become a truism that '*some* form of hearing' is required[.]") (italics in original); *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (Supreme Court has "consistently held that some form of hearing is required[.]"); *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 488 (6th Cir. 2014) ("[N]o dispute that never providing" a hearing violates due process).

So again, the lack of *any* hearing of *any* kind violates procedural due process and there is no need to apply the *Matthews* factors. But assuming the factors do apply, the lack of *any* hearing still violates procedural due process.  Here, Plaintiffs interests at stake are more than significant, as shown above. The risk of erroneous deprivation is high. Without *any* process of *any* kind, there is absolutely no review at all to make sure the justification was legal, justified, and appropriate. At the post-deprivation hearing Plaintiffs would have the *opportunity* to explain why their business should be able to stay open until 2:00 a.m., why they should be allowed to use their outdoor seating, and explain why they should be allowed to offer to-go sales. They could argue their business is better suited to handle COVID-19 issues. Finally, there is absolutely no good reason why the government would want to prevent the application of a post-deprivation hearing. This would be Defendant's opportunity to engage with Plaintiffs and offer further suggestions to mitigate COVID-19, etc. A modest hearing would impose some

government cost, but "these rather ordinary costs cannot outweigh the constitutional right. Procedural due process is not intended to promote efficiency or accommodate all possible interests: it is intended to protect the particular interests of the person whose possessions are about to be taken." *Fuentes v. Shevin*, 407 US 67, 91 n22 (1972) (cleaned up).

In sum, the Order violates due process because there is no opportunity for Plaintiffs to challenge the order on any grounds, before any party, neutral or otherwise. The Order was crafted by an unelected, unaccountable health officer and is precisely the kind of "one-sided determination of facts" *Fuentes* warns against. As the cases make clear, *some* hearing is required. But no hearing exists under the Order. For all of these reasons, no hearing equals no procedural due process.

### 4.2.1.5.   *Jacobson v. Massachusetts* Cannot Be Read to Dispense with Procedural Due Process.

*Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905) was "a case challenging a Massachusetts law that mandated smallpox vaccinations when the state was battling that disease." *First Baptist Church v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021, at *4 (D. Kan. Apr. 18, 2020). "*Jacobson* did not expressly purport to interfere with rights secured by the Constitution.*" Id.*

"Although the *Jacobson* Court unquestionably afforded a substantial level of deference to the discretion of state and local officials in matters of public health, it did not hold that deference is limitless. Rather—it closed its opinion with a *caveat* to the contrary: 'Before closing this opinion we deem it appropriate, in order to prevent misapprehension [of] our views, to observe—perhaps to repeat a thought already sufficiently expressed, namely—that

the police power of a state, whether exercised directly by the legislature, or by a local body acting under its authority, may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression.'" *Cty. of Butler v. Wolf*, No. 2:20-CV-677, 2020 WL 5510690, at *6 (W.D. Pa. Sept. 14, 2020).

In *County of Butler*, the Court applied "ordinary" canons of constitutional review (i*d.* at *5) for essentially four reasons. First, *Jacobson* was decided "over a century ago" and "[s]ince that time, there has been substantial development of federal constitutional law in the area of civil liberties." *Id.* at *6. Second, overly deferential review of emergency health measures undermines constitutional liberties. *Id.* at * 9 ("Suspension of normal constitutional levels of scrutiny may ultimately lead to the suspension of constitutional liberties themselves.") (cleaned up). Third, "ordinary constitutional scrutiny is necessary to maintain the independent judiciary's role as a guarantor of constitutional liberties—even in an emergency." *Id.* at 10. And fourth, ordinary scrutiny is appropriate because of the "ongoing and indefinite nature" of the pandemic and associated government restrictions of liberty. *County of Butler's* analysis is cogent, informative, and appropriate. But another reason exists. *Jacobson's* deferential analytical framework can lead to absurd results and was explicitly used to justify perhaps one of the worst cases in American history, *Buck v. Bell*, 274 U.S. 200, 207 (1927).[8]

---

[8] Of course, Plaintiffs are not comparing this case to the depravity of *Buck v. Bell*, but the point remains: *Jacobson*, taken to its analytical limits, fosters bad law.

The Sandbar has either been closed or restricted by Defendant's health orders since March 18, 2020, with few exceptions. The justification for the orders has been nearly the same, since March, and the current Order, as written, stands in perpetuity. (Doc. 13-1, "This order shall become effective as of 12:01 a.m. on October 2, 2020, and remain in force until rescinded or until modified."). Since the pandemic began, Plaintiffs have not been afforded any due process hearing of any kind. Moreover, once triggered, procedural due process *already* accounts for emergency situations, so there is no need to further dilute the standard under *Jacobson*.  *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) ("Due process is flexible and calls for such procedural protections as the particular situation demands.").

The very point of procedural due process is to protect liberty and property from arbitrary deprivations through procedural fairness. There is no good reason to abandon procedural due process during a pandemic. In fact, this is precisely the reason procedural due process exists to begin with – to prevent unfair, arbitrary, and rushed deprivations, by an un-elected, politically unaccountable bureaucrat without any substantive public oversight. It is perhaps more important than ever to afford due process hearings.

### 4.2.1.6. Issues Not Raised During the Motion for Preliminary Injunction are Preserved and Not Waived

Plaintiffs filed this motion for preliminary injunctive relief only on the grounds the Order violates procedural due process. However, Plaintiffs are **not** waiving their other claims, and in fact are preserving their other claims raised in the Complaint.

### 4.3. Plaintiffs will Suffer Irreparable Harm

Dr. Marcellino's orders have caused in the past, and the current iteration of the restaurant and bar curfew regime will continue to cause, significant injury. Under the totality of the circumstances, by arbitrarily limiting the hours in which commercial transactions can occur, by arbitrarily limiting off-premise alcohol sales, and by arbitrarily limiting outdoor seating, irreparable harm exists, especially when considering Dr. Marcellino's orders began in March. *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) ("A threat to trade or business viability may constitute irreparable harm. *See, e.g.*, *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125–26 (2d Cir.1984) (damages cannot fully compensate husband and wife for loss of years of effort and livelihood); *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24, 28–29 (2d Cir.1978) (possibility of going out of business is irreparable harm), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir.1970) (loss of right to continue business may support claim of irreparable injury)").

Further, the Order irreparably harms Plaintiffs' constitutional rights, which is sufficient. *See National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990).

### 4.4. Balance of Equities and the Public's Interest Favor an Injunction

On the other hand, Defendant Marcellino will not suffer any injury if restrained. There is no injury to the government when it is prevented from enforcing something unconstitutional. *See Joelner v. Village of Washington Park, Illinois*, 378 F.3d 613, 620 (7th Cir. 2004).

It is "always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd' sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) (emphasis added) (cleaned up); *See also Texans for Free Enterprise v. Texas Ethics Com'n*, 732 F.3d 535, 539 (5th Cir. 2013) (analyzing factor in First Amendment context).

## 5.   Security Bond Should Not Be Required

Kansas Justice Institute is pro-bono, public interest organization seeking to enforce public rights. Waiving the bond, or imposing a minimal bond, is therefore appropriate. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Circ. 2003) (Bond unnecessary "when [district court] concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct"). *See Save our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2004) (recognizing the court's "long-standing precedent that requiring nominal bonds is perfectly proper in public interest litigation"); *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002) (abrogated on other grounds); *Fish v. Kobach*, 189 F.Supp.3d 1107 (2016) (Court "may exercise its discretion and determine a bond is unnecessary if there is an absence of proof showing a likelihood of harm") (cleaned up).

## 6.   Conclusion

Plaintiffs are not asking for much. They are simply asking this Court to apply procedural due process requirements to Dr. Marcellino's Order.

Kansas Justice Institute
By:  Samuel G. MacRoberts, 22781

Dated: October 22, 2020

_____
Samuel G. MacRoberts
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Sam.MacRoberts@KansasJusticeInstitute.org
(913) 213-5018

25