John T. Bullock, KS #15119
Bradley R. Finkeldei #19470
**STEVENS & BRAND, L.L.P.**
900 Massachusetts St., Ste. 500
Lawrence, KS 66044-0189
785-843-0811 – Phone
785-843-0341 – Fax
Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| RICKY DEAN'S, INC., d/b/a THE SANDBAR; ) | |
| RITA "PEACH" MADL. ) | |
|        Plaintiffs, ) | |
| v. ) | Case 5:20-CV-04063 |
| THOMAS MARCELLINO, M.D., *et al* ) | |
| ) | |
|       Defendants. ) | |

## DEFENDANT DR. MARCELLINO'S OPPOSITION TO PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION

COMES NOW Defendant Thomas Marcellino, MD, in his official capacity, by and through his attorneys, John T. Bullock, Bradley R. Finkeldei, and Kate M. Simpson of the firm Stevens & Brand, L.L.P., and for its Opposition to Plaintiffs' Request for Preliminary Injunction states as follows:

### I.     Introduction

Plaintiffs' motion seeks a ruling from this Court that Plaintiffs have a constitutionally protected right to sell alcoholic beverages late at night in Lawrence, Kansas, and that any limitation of such a right, even a minimal restriction during a global pandemic, violates their right to procedural due process. Plaintiffs seek an order compelling the Public Health Officer to conduct a hearing or provide some other process for the Sandbar that, by extension, would require comparable hearings or due process for all 171 establishments holding liquor licenses in Douglas County. Plaintiffs' motion should be denied because they cannot show the necessary prerequisites for issuance of a preliminary injunction: (1) a likelihood of success on the merits;

(2) a likelihood the movant will suffer irreparable harm if the injunction is not issued; (3) the balance of the equities tips in the movant's favor; and (4) that granting the injunction is in the public's interest. *See Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016).

As argued below, Plaintiffs cannot show a likelihood of success on the merits because they have no protectable liberty or property interest in selling alcohol after 11 p.m. In Kansas, there is no constitutionally protected right to sell liquor. The Kansas Legislature has decreed that a liquor license is "purely a personal privilege" and "shall not constitute property." K.S.A. 41-326(a). This statutory language has been applied by both the Kansas Supreme Court and in the District of Kansas to mean what it says. Federal courts look to whether state law creates a constitutionally protected property interest under the circumstances of each particular case. In Kansas, both the Legislature and the Kansas Supreme Court have clearly stated that there is no property interest in a liquor license.

Likewise, Plaintiffs' assertion that they have a constitutionally protected right to earn profits or, generally, to do business, is not supported by legal precedent. Indeed, courts all over the country have rejected this argument in connection with COVID-related bar closure orders.

Even if Plaintiffs could show that they have a constitutionally protected liberty or property interest under Kansas law, there has been no deprivation of such right. A modest limitation on hours of operation for the sale of liquor is not a "deprivation" of a property interest. Even total closures have been upheld as not depriving businesses of their licenses. Here, Dr. Marcellino's order allows establishments with liquor licenses to remain open and operate, with only a very limited restriction on late night hours and liquor sales.

Even if Plaintiffs could establish that they have a constitutionally protected liberty or property interest to sell liquor late at night, and that the government has deprived them of such an

interest, there is no additional process required because the Health Order restrictions are generally applicable to all holders of a liquor license in the County. This type of administrative action is not adjudicative; that is, the Public Health Officer did not individually determine what limitations should apply to each individual establishment. Courts have found that individual due process is not necessary in the case of generally applicable orders, such as this one.

Additionally, courts nationwide have relied on United States Supreme Court precedent in *Jacobson v. Massachusetts*, 197 U.S. 11, 29, 25 S.Ct. 358 (1905), to uphold summary administrative action in emergency situations, such as a global pandemic.

It is under this long-held precedent and in light of the global COVID-19 pandemic that this Court considers the present request for a preliminary injunction by Plaintiffs, who seek an order that Dr. Marcellino must conduct a due process hearing for Plaintiffs, with the hope that they will be exempted from a generally applicable Health Order instituted to protect Douglas County citizens from the spread of COVID-19. For the reasons set forth below, this request for preliminary injunction should be denied.

## II.    Plaintiffs Cannot Satisfy the Four Prerequisites for a Preliminary Injunction

Granting a preliminary injunction is an extraordinary remedy and no injunction should issue unless the movant's right to relief is "clear and unequivocal." *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001). The four criteria a movant must demonstrate in a clear an unequivocal manner are: (1) a likelihood of success on the merits; (2) a likelihood the movant will suffer irreparable harm if the injunction is not issued; (3) the balance of the equities tips in the movant's favor; and (4) that granting the injunction is in the public's interest. *See Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016). As set forth below, Plaintiffs' request for preliminary injunction fails to satisfy these requirements and should be denied.

**A.      Plaintiffs Cannot Demonstrate They Have a Likelihood of Success on The Merits**

**1.      Standard of Review for Government Actions in a Public Health Crisis**

In working to protect the citizens of Massachusetts from a smallpox epidemic in 1905, the government of Massachusetts instituted various protective measures. Not surprisingly, some individuals negatively affected by those protective measures sought relief in court. In reviewing those governmental restrictions, the United States Supreme Court held that government action taken in the context of a public health crisis is subject to deferential review:

> In every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.

*Jacobson v. Massachusetts*, 197 U.S. 11, 29, 25 S.Ct. 358 (1905). The Court explained that "[a] community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27. This deferential standard has been applied over the years and is being applied today during the COVID-19 pandemic. As Justice Roberts recently opined for the United States Supreme Court:

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." When those officials "undertake[] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people. . . . That is especially true where, as here, a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground.

*S. Bay United Pentecostal Church v. Newsom*, 140 S.Ct. 1613, 1613–14 (May 29, 2020) (internal citations omitted) (refusing to overturn California's COVID-19 related health orders restricting business operations).

As such, states and local communities have broad powers to act during an emergency to secure public health and safety. The Court's standard of review is limited when reviewing the exercise of emergency powers. *See Jacobson*, 197 U.S. at 29.  But emergency powers are not unfettered. A governmental entity "may implement emergency measures that curtail constitutional rights so long as the measures have at least some real or substantial relation to the public health crisis and are not beyond all question a plain, palpable invasion of rights secured by the fundamental law." *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) (quoting *Jacobson*, 197 U.S. at 31).

Under the *Jacobson* test, courts must also take care not to "second-guess the wisdom or efficacy of the measures." *Id.* at 785 (citing *Jacobson* at 28, 30) (explaining that "[i]t is no part of the function of a court . . . to determine [what is] likely to be the most effective for the protection of the public against disease." *Id.* at 778.) *See also Hickox v. Christie*, 205 F. Supp. 3d 579, 592 (D. N.J. 2016) (citing case law that a public health official's "better-safe-than-sorry determination was  . . . entitled to deference, absent a reliable showing of error" *Id.*).

In this case, there can be no dispute that the Public Health Order (Doc. 13-1) has a real and substantial relationship to the COVID-19 pandemic. *See* Aff. of Dr. Marcellino, ¶ 4–19, attached hereto as Exhibit 1. Thus, as to Plaintiffs' procedural due process claim, the standard of review is whether the Public Health Order's restrictions are "beyond question, in palpable conflict with the Constitution." As set forth below, the Health Order's limitations are clearly not in palpable conflict with Plaintiffs' due process rights, so their motion must be denied.

### 2.        Procedural Due Process

The Due Process Clause of the Fourteenth Amendment guarantees that no person shall be deprived "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Procedural due process under the Fourteenth Amendment "imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901 (1976). However, to establish a procedural due process claim, a plaintiff must show that: "(1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006).

First, Plaintiffs cannot show that they have a constitutionally cognizable property interest in being allowed to sell alcohol after 11:00 p.m. Second, Plaintiffs cannot show that this temporary, limited regulation, issued in response to a recognized pandemic, is a deprivation of any protectable property interest. And third, because the Health Order applies generally to all establishments with liquor licenses in Douglas County, no additional process is required.

### 3.        Plaintiffs Have No Property Interest in Selling Alcohol After 11:00 p.m.

"Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709 (1972). "Thus, statutes, ordinances, contracts, implied contracts, and rules and understandings developed by state officials create and define constitutionally protected

property interests." *Klaassen v. Univ. of Kan. Sch. of Med.*, No. 13-2561-DDC-KGS, 2015 WL 2400773, at *2 (D. Kan. May 15, 2015) (citing *Fisher Sand & Gravel, Co. v. Giron*, 465 F. App'x 774, 779 (10th Cir. 2012)). "To have a property interest, an individual must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Brown v. Univ. of Kan.*, 16 F. Supp. 3d 1275, 1288 (2014) (quoting *Lemon v. Labette Cmty. Coll.*, 6 F. Supp. 3d 1246, 1250 (D. Kan. 2014)). Where a plaintiff fails to establish the first element of a due process claim, the Court need not consider whether the government employed an adequate level of procedural process. *Seifert v. Kan. City. Kan. Cmty. Coll.*, No. 8-2427-EFM-JPO, 2010 WL 690938, at *8 (D. Kan. Feb. 24, 2010).

Plaintiffs appear to identify three putative liberty or property interests: (1) a property interest in their liquor license; (2) a liberty interest in the right to earn a living; and (3) a property right to use their property after 11 p.m. (Doc. 15 at 9–14.)  But Plaintiffs do not identify the source of these alleged rights under Kansas law— *i.e.,* what statute, ordinance, contract, implied contract, rule or understanding developed by a state official creates or defines any of these alleged interests. As set forth below, Plaintiffs fail to demonstrate a protectable property or liberty interest, and as such, their due process claim fails.

### (a)  Plaintiffs have No Property Right in Their Liquor License

Plaintiffs argue that they have a constitutionally protectable interest in their liquor license. (Doc. 15 at p. 10-14.) This argument fails because, in Kansas, a liquor license is purely a personal privilege; it does not create or confer any property rights.

The Kansas Legislature has declared that a liquor license is "purely a personal privilege" and "shall not constitute property." K.S.A. 41-326(a). Indeed, the Legislature took pains to negate every possible "stick" in the bundle of ostensible property rights in a liquor license:

> A license shall be purely a personal privilege, valid for not to exceed two years after issuance, except as otherwise provided by law, unless sooner suspended, involuntarily canceled or revoked, and shall not constitute property, nor shall it be subject to attachment, garnishment or execution, nor shall it be alienable or transferable, voluntarily or involuntarily, or subject to being encumbered or hypothecated. A license shall not descend by the laws of testate or intestate devolution but shall cease and expire upon the death of the licensee except that executors, administrators or representatives of the estate of any deceased licensee and the trustee of any insolvent or bankrupt licensee, when such estate consists in part of alcoholic liquor, may continue the business of the sale, distribution or manufacture of alcoholic liquor under order of the appropriate court and may exercise the privilege of the deceased, insolvent or bankrupt licensee after the death of such decedent, or after such insolvency or bankruptcy, until the expiration of such license but not longer than one year after the death, bankruptcy or insolvency of such licensee.

K.S.A. 41-326(a).

The Kansas Supreme Court has likewise affirmed that, under Kansas law, a liquor license "is a personal privilege and not a property right." *Murphy v. Curtis*, 184 Kan. 291, 294, 336 P.2d 411, 414 (1959). In so holding, the Court relied on an earlier version of K.S.A. 41-326, which included the same operative language as that quoted above. *Id.* at 294.

The Court should apply Kansas law to find that Plaintiffs do not have a constitutionally protectable interest in their liquor license. This is precisely what the Tenth Circuit Court of Appeals did in a recent case, albeit one decided under Wyoming law. See *Rocky Mountain Rogues, Inc. v. Alpine*, 375 F. App'x. 887 (10th Cir. 2010). In *Rocky Mountain*, the Bull Moose Saloon asserted a due process claim arising out of the town's handling of its liquor license. *Id.* at 894. The Tenth Circuit Court of Appeals noted that "the sale of liquor is generally considered an area where broad government regulation is reasonable." *Id.* (citing *Albertson's, Inc. v. Sheridan*, 33 P.3d 161, 186 (Wyo. 2001)). The court cited Wyoming precedent holding that there is no vested right in a liquor license, and that "a liquor license is a mere privilege." *Id.* at 895 (citing

*Albertson's* at 168). The court concluded that "under Wyoming law, the Bull Moose had no protected property interest in the continuation of its liquor license." *Id*. at 895.

It is instructive that, in *Rocky Mountain*, the Tenth Circuit looked to Wyoming precedent to determine whether the Bull Moose Saloon had a constitutionally protectable right in its liquor license.[1] In *Albertson's*, the Wyoming Supreme Court made it clear that, in Wyoming, "[a] liquor license is a mere privilege, which is at all times in the control of the legislature." *Albertson's*, 33 P.3d at 168 (citing 45 Am. Jur. 2d *Intoxicating Liquors* § 177 (1999)). The Wyoming Supreme Court also cited a state statute providing that a liquor license is "a personal privilege." *Id.* at 161. The Tenth Circuit, in turn, relied upon this authority to hold that the Bull Moose Saloon did not have a protected property interest in its liquor license.

Like Wyoming, Kansas state law is clear that a liquor license is a personal privilege, and cannot become a vested or protected right. K.S.A. 41-326; *Murphy*, 184 Kan. at 294 (explaining that "a [liquor] license is a personal privilege and not a property right"). Also like Wyoming, the Kansas Supreme Court has recognized the wide latitude given state government to regulate the sale and consumption of alcoholic beverages in its exercise of the police power. *See*, *e.g*., *Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, 754, 408 P.2d 877, 884 (1965). As the Kansas Supreme Court explained: "The power of the legislature to regulate alcoholic liquor is broader than the power to regulate ordinary business due to its possible source of danger to the public which is not inherent to other businesses and alcoholic liquor occupies a different status before the courts and the legislatures from other kinds of property." *Id*. This confirms that, as in *Rocky Mountain*, Plaintiffs in this case have no constitutionally protectable interest in a liquor license.

---

[1] See *Dickeson v. Quarberg*, 844 F.2d 1435, 1437–1438 (10th Cir. 1988) (explaining that "Property interests are not created by the Constitution, but arise from independent sources such as state statutes, local ordinances, established rules, or mutually explicit understandings." *Id.*).

In light of all the foregoing authority, it is easy to dispose of the cases relied upon by Plaintiffs. One such case actually supports Defendant's position. See *In re Disc Heat, LLC*, No. 13-10568, 2013 WL 6080183, at *1 (Bankr. D. Kan. Nov. 18, 2013). In that case, Chief Judge Nugent relied on K.S.A. 41-326 to hold that a Kansas liquor license is a personal privilege, not a property interest. *Id*. at *2 (by statute, a liquor license "shall be purely a personal privilege . . . and shall not constitute property." Id.) Judge Nugent further explained that a liquor license cannot be encumbered or transferred, and only upon a court order can a liquor license descend under the probate laws. *Id*. Accordingly, Judge Nugent concluded: "a Kansas liquor license is not a property interest." *Id.*

In the face of this and other Kansas authority on point, Plaintiffs ask the Court to look "beyond the labels, so to speak," citing a case from the Sixth Circuit. (Doc 15, at 12.) But the case relied upon, *Brookpark Entm't, Inc. v. Taft*, 951 F.2d 710, 714 (6th Cir. 1991), is easily distinguished. In that case, the court considered whether a state-issued liquor license conferred a property interest. The court began its inquiry "by examining the interests that attach to an Ohio liquor license." *Id*. The court referenced the applicable statute, noting that Ohio law allows a liquor license to be transferred, sold, inherited, and renewed. *Id.* The court recited some other attributes of an Ohio liquor license, emphasizing again that it can be "sold and bequeathed." *Id*. at 715. This is a material distinction from K.S.A. 41-326, which negates any claim to property interests in a Kansas liquor license. Thus, the underpinnings of the decision in *Brookpark* are very different from how a liquor license is treated under Kansas statute. It should also be noted that, after the Sixth Circuit's decision in *Brookpark*, the Ohio Court of Appeals expressly rejected the Sixth Circuit's ruling, reaffirming that, in Ohio, a liquor license is a privilege, "not a property right in the constitutional sense," and "not property." *Bar-Tec, Inc. v. Ohio Dep't. of*

*Liquor Control*, No. 95APE10-1331, 1996 WL 87437, at *5 (Ohio Ct. App. Feb. 29, 1996). The decision in *Brookpark* cannot be reconciled with Ohio law, let alone Kansas law. It is not persuasive here.

The other cases Plaintiffs rely on are likewise easily distinguished. For example, in *Tanasse v. St. George*, 172 F.3d 63 (Table), 1999 WL 74020 (10th Cir. 1999), the court considered a claim that a city in Utah had unlawfully revoked a club owner's city-issued business licenses, one of which related to the sale of beer. Significantly, unlike K.S.A. 41-326, the St. George City Code did not have a provision specifying that a license to sell beer was a mere privilege, and not property. In addition, unlike in *Rocky Mountain*, the *Tanasse* court did not have any state case law to rely upon—the license in question was issued under a city code. The court, therefore, resorted to more generic authority concerning driver's licenses, *Bell v. Burson*, 402 U.S. 535 (1971), and a Fourth Circuit case about a city ordinance that closed certain nightclubs in a run-down part of town, largely on estoppel grounds. *Richardson v. Eastover*, 922 F.2d 1152, 1156–58 (4th Cir. 1991). By contrast, in *Rocky Mountain*, the court looked at state law, under circumstances very comparable to this case, and easily determined that the Bull Moose Saloon did not have a constitutionally protected right in a state-issued liquor license. The *Rocky Mountain* decision is on point, *Tanasse* is not.

Plaintiffs also cite *Frazier v. Saint George*, 268 P.3d 12 (table), 2012 WL 309088 (Kan. App. 2012), to assert that, over time, a liquor license may become a property interest. But *Frazier* does not stand for this proposition. In *Frazier*, the plaintiff complained that the city improperly denied her a city-issued liquor license. The issue presented was whether mandamus was the appropriate remedy. *Frazier*, 268 P.3d 12, at *5. Under the particular facts and circumstances of the case, the court found that principles of equitable estoppel imposed a duty on

the city to issue the permit. *Id.* at *6. Accordingly, issuance of the permit was a ministerial act, for which the remedy of mandamus was available. *Id*. But *Frazier* did *not* hold that a state-issued liquor license confers a constitutionally protected property interest, or that such an interest can develop "over time." Nor did *Frazier* involve interpretation or application of Kansas state law regarding liquor licenses, including the express provisions of K.S.A. 41-326. And, significantly, F*razier* did not hold that principles of equitable estoppel can create constitutional rights in connection with a state-issued liquor license. In short *Frazier* is a mandamus and estoppel case involving a city license; it is not applicable to the issue at hand.

Plaintiffs do not cite any legal authority to establish that there is a constitutionally protectable property interest in a Kansas liquor license. Indeed, Kansas statute and court precedent make it absolutely clear that, in Kansas, a liquor license is a mere privilege and does not constitute or confer any property rights. As in *Rocky Mountain*, this Court should follow state law and conclude that there is no constitutionally protectable interest in Plaintiffs' liquor license. And, although not directly pertinent to the pending motion, it is worth considering the additional repercussions that might flow from a decision of this Court that, despite the express language of K.S.A. 41-326, there is indeed a constitutionally protected property interest in a state-issued liquor license. At a minimum, such a ruling could create implications in bankruptcy, probate, and commercial proceedings, and perhaps adversely impact public officials seeking to regulate the distribution, sale, and consumption of alcoholic liquor. In any event, the law is clear: in Kansas, a state-issued liquor license is a mere privilege; it is not property; and the license does not create or confer a constitutionally protectable right.

### (b) Plaintiffs Fail to Demonstrate a Relevant Liberty or Property Interest

Plaintiffs argue that they have an interest in "making a living," "operating their business," and using their property after 11:00 p.m. (Doc. 15, p. 9–10, 13–14.) But the Public Health Order does not revoke or remove Plaintiffs' ability to earn a living. The Sandbar and other Douglas County establishments with liquor licenses are only prohibited from selling alcohol after 11 p.m. and are required to close at midnight. Significantly, the Supreme Court has held that, while the assets of a business are unquestionably "property," the "activity of doing business, or the activity of making a profit is not property in the ordinary sense." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ.*, 527 U.S. 666, 675, 119 S.Ct. 2219, 2225 (1999). There is, in short, no broad right to do business guaranteed by the United States Constitution. *Id.; see also Pollard v. Cockrell*, 578 F. 2d 1002, 1012 (5th Cir. 1978) (rejecting any notion of a "constitutionally guaranteed right to pursue a legitimate business" *Id.*).

Plaintiffs cite a string of cases in support of their claim that they are being deprived of their liberty interest in being able to earn a living due to these restrictions, but these cases do not support Plaintiffs' position.

Plaintiffs cite *Stidham v. Peace Officer Standards and Training* for the proposition that the right to earn a living is a protected liberty interest for procedural due process claims. 265 F.3d 1144, 1149–1150 (10th Cir. 2001). *Stidham* involved a police officer's claim that his peace officer certification was effectively revoked without due process when the defendant "disseminated unproven and highly damaging allegations" against him, effectively making it impossible for him to find work as a peace officer. *Id.* at 1151. The Tenth Circuit determined that "the revocation or removal of a license or certificate that is essential in the pursuit of a livelihood requires procedural due process." *Id.* at 1150 (quoting *Bell*, 402 U.S. at 539). The court also

found that "[a]ctions taken by the State which destroy the value or utility of a protected property interest constitute a Fourteenth Amendment deprivation of that interest for which due process cannot be denied." *Id.* at 1153.

In contrast, Plaintiffs' liquor license has not been revoked or removed by the Public Health Order. The order imposes very limited restrictions, as described above. Plaintiffs may use, and are in fact using, the liquor license except as minimally limited by the Public Health Order. Plaintiffs have provided no evidence that the liquor license's value or utility is destroyed by the Public Health Order. Absent such a showing, *Stidham* is distinguishable and inapplicable to the facts of this case.

Plaintiffs also rely on *Lentsch v. Marshall*, for the proposition that "[t]he liberty interest that due process protects includes the individual's freedom to earn a living." 741 F.2d 301, 303 (10th Cir. 1984). *Lentsch* involved a public employee who sued the city after she was fired. The plaintiff asserted a property interest in her continued employment as a dispatcher. *Id.* at 305. This type of claim requires the court to look at the particular statutes, ordinances, or agreements between the parties, because at-will employees have no protected property interest but, where the governing agreements require dismissal to be based on cause, a protected property interest can arise. *Id.* The Tenth Circuit accordingly applied Utah law to determine whether plaintiff had a protected property interest in her job. *Lentsch* is thus inapplicable to this case, except for the general proposition that a protected interest in the freedom to earn a living may exist under certain circumstances. Plaintiffs still have the burden to establish the liberty or property interest they have in operating the Sandbar free from the Public Health Order's minimal restrictions, and they fail to do so.

14

Next Plaintiffs cite *Ward v. Anderson*, 494 F.3d 929 (10th Cir. 2007). The plaintiffs in *Ward* owned a child care center. They alleged that Department of Family Services employees violated their due process rights when the Department stated it had substantiated allegations of child care licensing rule violations during an investigation at the plaintiffs' facility. The court summarily opined that "it seems self-evident that [plaintiffs] have a significant interest in the health and success of their child-care business," but the court did not actually analyze the plaintiffs' alleged interest because it found plaintiffs were not deprived of any opportunity to operate their business. *Id.* at 935–36. "[I]nstead, they were only subject to the temporary anxiety and potential stigma of the substantiated allegations . . ., which were eventually withdrawn by DFS without any action having been taken against their license." *Id.* at 936. The court noted: "In determining what process is due, account must be taken of the *length* and *finality* of the deprivation." *Id.* (emphasis in original). The court explained that while the plaintiffs "were under the cloud of the substantiated allegations" for about nine months, and "their ability to run their business and earn income was never suspended . . . their private interest, though significant, is attenuated." *Id.*

Here, Dr. Marcellino has not suggested that the Plaintiffs are bad actors, have failed to comply with statutes or regulations, or otherwise impugned Plaintiffs' reputation or damaged their public image. Plaintiffs are subject to the Public Health Order, just like every other Douglas County establishment holding a liquor license. Likewise, the Public Health Orders are temporary. They are only in effect due to the global pandemic, are constantly under review, and are updated as circumstances change. *Ward* supports Dr. Marcellino's position, not Plaintiffs'.

Finally, Plaintiffs cite the concurrence in *Wise v. Bravo* for the proposition that "[l]ike the right to marry and have children and the right to live where one wants and pursue a livelihood by

any lawful means, this right constitutes a liberty interest." *Wise v. Bravo*, 666 F.2d 1328, 1336 (10th Cir. 1981)). *Wise* is a case about the right to have a relationship with one's child. The court does not discuss the liberty interest in pursuing a livelihood by any lawful means, other than the general quote above. It provides no support for the notion that the Public Health Officer's temporary and limited restrictions deprive Plaintiffs of their right to pursue a livelihood by lawful means. To the contrary, Plaintiffs continue to operate their business and earn a living by operating the Sandbar within the Public Health Order's minimal limitations.

Most courts have held that, in the current COVID-19 crisis, temporary closure of a business does not implicate procedural due process rights. *See e.g. Talleywhacker, Inc. v. Cooper*, No. 5:20-CV-218-FL, 2020 WL 3051207, at *12 (E.D.N.C. June 8, 2020); *Xponential Fitness v. Arizona*, No. CV-20-01310-PHX-DJH, 2020 WL 3971908, at *5 (D. Ariz. July 14, 2020); *910 E Main LLC v. Edwards*, No. 6:20-CV-00965, 2020 WL 4929256, at *8 (W.D. La. Aug. 21, 2020). These and other courts have rejected procedural due process challenges to COVID-19 restrictions on the grounds that a general right to operate a business is not a constitutionally protected right, and thus the restrictions are certainly not in "palpable conflict with the Constitution."

### 4.  Even if Plaintiffs Have a Property Right, There Has Been No Deprivation

In *Professional Beauty Federation of California v. Newsom*, plaintiffs engaged in the cosmetology industry in California challenged Governor Gavin Newsom's Stay at Home Order. No. 2:20-cv-04275-RGK-AS, 2020 WL 3056126, at *1 (C.D. Cal. June 8, 2020). In relevant part, the court found that "[t]he State has not deprived Plaintiffs of their licenses to practice cosmetology. Although the Stay at Home Order might effectively prevent Plaintiffs from *using* their licenses to practice cosmetology, it does not deprive them of those licenses. Thus, the Court

finds that Plaintiffs have not met then [sic] burden to show that the Stay at Home Order is beyond all question, a plain, palpable invasion of Plaintiffs' right to procedural due process." *Id.* at *7 (citing *Jacobson*, 197 U.S. at 31) (emphasis in original). The same can be said of Dr. Marcellino's Health Order. The only restriction is a temporary limitation of Plaintiffs' right to sell liquor late at night, it is not a deprivation of any putative liberty or property right.

Plaintiffs again rely on *Stidham* for the proposition that the court should "look at the substance of the actions taken relative to a constitutionally protected right" and that the government "cannot escape liability for depriving an individual of a legitimate property interest merely by arguing that it has not revoked or destroyed the actual legal title to that interest." (Doc. 15 at14–15) (quoting *Stidham*, 265 F.3d at 1152–53). But the facts of that case are distinguishable. In *Stidham*, the Tenth Circuit found that the government acted outside its statutory authority, "in contravention of statutorily mandated procedural due process," by "disseminat[ing] false and fatally damaging allegations" about the plaintiff, causing the plaintiff to be unable to use his officer's certification to get a job as a police officer. *Stidham*, 265 F.3d at 1153. The court found that "actions taken by the State which destroy the value or utility of a protected property interest constitute a Fourteenth Amendment deprivation of that interest for which due process cannot be denied." *Id.* Here, there is no dispute that Plaintiffs' liquor license has not been revoked or removed. The Sandbar can sell liquor until 11 p.m., and can stay open until midnight under the current orders. This is not the type of government action that "destroy[s] the value or utility" of a protected interest. Plaintiffs are still able to operate their business and use their liquor license, albeit within the minimal limits of the Public Health Orders.

In *Odhuno v. Reed's Cove Health and Rehabilitation, LLC*, this Court analyzed *Stidham* in the case of a former employee who sued the Secretary of the Kansas Department for Aging

and Disability Services alleging, among other things, that the defendants "effectively revoked his CNA certification without due process of law." 355 F. Supp. 3d 1026, 1041 (D. Kan. 2018). This Court held that the plaintiff's claim that his CNA license was effectively revoked by these abuse allegations was insufficient to show that his license was effectively revoked for due process purposes because the plaintiff failed to show that the defendants' actions destroyed the value of his CNA license. *Id.* at 1042. Because the plaintiff failed to show that the value of his license was effectively destroyed, he failed to meet his burden that the defendants "deprived him of a constitutionally protected property interest without due process." *Id.* at 1043. The same reasoning applies here. Plaintiffs cannot show that their liquor license or any other putative constitutionally protected interests are rendered valueless by the Public Health Order, which minimally restricts Plaintiffs' operations late at night.

In *Gorenc v. Klassen*, nurse-midwives sued the president of the state board of nursing, claiming the government violated their due process rights by "revoke[ing] or interfer[ing] with plaintiffs' ability to secure" a collaborative practice agreement ("CPA") with a doctor that would grant them admitting privileges at a particular hospital in the KC Metro area, thereby damaging plaintiffs' client relationships. 421 F. Supp. 3d 1131, 1162 (D. Kan. 2019). The court similarly reasoned that plaintiffs' due process claims failed because they did "not allege that their nursing licenses [were] at risk, that they [were] deprived entirely of the ability to practice as APRNs without a [CPA], or that they [were] deprived of the ability to seek a CPA with another physician if their existing agreement end[ed]." *Id.* at 1163. These findings indicate that a temporary, limited order that allows Plaintiffs to continue to operate the Sandbar, albeit for slightly shortened hours, does not constitute the type of deprivation that triggers due process protections.

Finally, Plaintiffs cite *Reed v. Village of Shorewood* for the proposition that the word "deprive in the due process clause cannot just mean destroy. . . . A property right is not bare title, but the right of exclusive use and enjoyment." (Doc. 15 at 14) (quoting *Reed*, 704 F.2d 943, 949 (7th Cir. 1983). But *Reed* is distinguishable. It involved a bar that provided live rock-and-roll music. *Id.* at 948. Shorewood officials completely deprived the plaintiffs' business of any value by engaging in various efforts to harass the plaintiffs and their customers, including suspending the bar's liquor license, and eventually interfering with the plaintiffs' attempt to sell the bar, such that plaintiffs just had to shut down their bar and surrender their liquor license. *Id.* at 947–48. The Public Health Order in this case comes nowhere close to the level of deprivation described in *Reed*. Plaintiffs fail to show that the Health Order's limited restrictions "deprive" them of any constitutionally protectable interest.

### 5.    Even if Plaintiffs Have a Property Right, Plaintiffs Have Received Adequate Due Process

The third issue Plaintiffs must demonstrate to establishing that they have a likelihood of prevailing on the events of their procedural due process claim is to prove that they were not afforded adequate procedural rights in connection with deprivation of a protectable property interest. Thus, even if Plaintiffs establish that they have a property interest, and that the Public Health Order deprived them of that property right, Plaintiffs must show that the process was constitutionally adequate in their particular situation. Plaintiffs cannot do so.

The law is clear that a due process hearing is not required where the restriction at issue is a generally applicable order, as is the case here. *See Neinast v. Bd. of Trs. of Columbus Metro. Library*, 346 F.3d 585, 596 (6th Cir. 2003) ("Governmental determinations of a general nature that affect all equally do not give rise to a due process right to be heard."); s*ee also Okla. Educ. Ass'n v. Alcoholic Beverage Laws Enf't Comm'n*, 889 F.2d 929, 936 (10th Cir. 1989) ("When the

legislature passes a law which affects a general class of persons, those persons have all received procedural due process—the legislative process.").

This issue has been extensively litigated in the last six months as citizens have challenged health orders across the county. In nearly every case, and in all cases related specifically to the closure of establishments with liquor licenses, no due process violations have been found, because the health orders are of general applicability rather than adjudicative. For example, in *Hartman v. Acton*, No. 2:20-CV-1952, 2020 WL 1932896, at *7 (S.D. Ohio Apr. 21, 2020,) the court held that a health order "directing non-essential businesses to cease operating their physical locations did not violate Plaintiffs' due process rights because the [Health] Order was a generally applicable order affecting thousands of businesses, and not a decision targeting an individual or single business." *Id.*) (citing *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 216 (6th Cir. 2011); *Bi–Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141 (1915) (noting that even though an individual's property rights may be affected by legislative action, "[w]here a rule of conduct applies to more than a few people, it is impracticable that everyone should have a voice in its adoption"); *Pickney Bros., Inc. v. Robinson*, No. 98-5097, 1999 WL 801514, at *4 (6th Cir. Sept. 30, 1999) (quoting *Nasierowski Bros. Inc. v. Sterling Heights*, 949 F.2d 890, 896 (6th Cir. 1991), for the principle that "[g]overnmental determinations of a general nature that affect all equally do not give rise to a due process right to be heard. But, when a relatively small number of persons are affected on individual grounds, the right to a hearing is triggered.").

Likewise, in *Bimber's Delwood, Inc. v. James*, No. 20-CV-1043S, 2020 WL 6158612, at *15 (W.D.N.Y. Oct. 21, 2020), the court held that due process protections only apply "when official action is designed to adjudicate disputed facts in particular cases." (citing *United States*

*v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245, 93 S. Ct. 810 (1973)). When official action is legislative in nature, it "is not subject to the notice and hearing requirements of the due process clause." *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 142 (2d Cir. 1994) (citing *RR Vill. Ass'n v. Denver Sewer Corp.*, 826 F.2d 1197, 1204–05 (2d Cir. 1987)).

Although Plaintiffs do not address the fact that this Health Order is of "general applicability," as opposed to adjudicative, and that no additional process is required, Plaintiffs do argue that the Health Order is not "legislative." Plaintiffs suggest that due process is therefore required, even though the Public Health Order applies to all 171 establishments with liquor licenses in Douglas County. (Doc 15, p. 16-17.) Plaintiffs' further assert the Public Health Order is "not subject to the political process" and  was issued "by fiat, insulated from any land of real citizen participation." (Doc 15, at 17.) But plaintiffs disregard that the authority conferred on the Public Health Officer is established by the Legislature. *See* K.S.A. 65-202, 65-119, and 65-129b. The Public Health Officer is subject the oversight of the Lawrence Douglas County Health Board, a statutory entity established and governed by the City of Lawrence and Douglas County. *See* K.S.A. 60-205 and 60-212. Moreover, the Kansas Legislature gave Kansas counties legal authority to repeal, amend, or modify any order of a local Public Health Officer. *See* K.S.A. 62-202 (amended by HB 2016 June 4, 2020). Plaintiffs' statement that there is "no political remedy to be had" is thus demonstrably wrong. Plaintiffs could seek modification of the operative state statutes in the Legislature, present their concerns to the Lawrence Douglas County Board of Health, or make an appeal for change to the County Commission. *Id.* That those efforts might be time-consuming, or ultimately unsuccessful, does not mean that there is no political remedy. The Health Order is generally applicable, not adjudicative, and therefore no additional process is due.
.

The legislative nature of a generally applicable health order has been addressed several times in recent pandemic cases, as state governors, state health officers, and local health officers have issued health orders to protect their citizens from COVID-19's uncontrolled spread. For example, the New York District Court found that the New York Legislature could have vacated the health order at any time and "[p]laintiffs have thus received all of the process due through the legislative determinations." *Bimber's Delwood*, at *15 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433, 102 S. Ct. 1148, (1982)); *see also Murphy v. Lamont*, No. 3:20-CV-0694 (JCH), 2020 WL 4435167, at *11 (D. Conn. Aug. 3, 2020) (finding Connecticut governor's COVID-19 Executive Orders to be a legislative act of general applicability not subject to the procedural protections in the due process clause); *Jones v. Governor of Fla.*, 975 F.3d 1016, 1048 (11th Cir. 2020); *United States v. Fla. E. Coast Ry. Co*., 410 U.S. 224, 245, 93 S.Ct. 810, 821, (1973) (explaining that "[w]hile the line dividing them may not always be a bright one, these decisions represent a recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other."); *Hartman*, 2020 WL 1932896, at *7 (explaining that "[a]s indicated above, both the Supreme Court and the Sixth Circuit have confirmed that administrative orders can qualify as legislative acts of general applicability, so long as they are not adjudicative." *Id.*).

The legislative nature of a local health officer's order is particularly clear in Kansas where the Kansas Legislature met in special session on June 4, 2020 and took various actions to: (1) curtail the powers of the Governor to issue statewide emergency/health orders; (2) made clear that county commissions could amend or revoke any health order issued by a local health officer; but (3) took no action whatsoever to alter the power of the local health officer. *See* HB2016

(June 4, 2020). As such, there is no doubt that the Public Health Order is of general applicability, not adjudicative. As such, Plaintiffs are not entitled to further process.

Accordingly, plaintiffs do not demonstrate a clear or substantial likelihood of proving "beyond all question, a plain palpable invasion" of their procedural due process rights under the Fourteenth Amendment.

### 6.      The Public Health Order is a Valid Summary Administrative Action

Finally, even if Plaintiffs could show they have been deprived of a constitutionally protected interest that is adjudicative in nature, the current pandemic alters the usual due process considerations. Procedural due process "is not a technical conception with a fixed content unrelated to time, place and circumstance." *Gilbert v. Homar*, 520 U.S. 924, 930, 117 S.Ct. 1807, 1812 (1997). With this concept in mind, the Supreme Court has held that "summary administrative action may be justified in emergency situations." *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300, 101 S.Ct. 2352, 2372 (1981). Indeed, a "deprivation of property to protect the public health and safety is [o]ne of the oldest examples of permissible summary action." *Id.* (quoting *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 599, 70 S.Ct. 870, 872 (1950)). The COVID-19 pandemic is, without a doubt, an unprecedented emergency that allows for summary actions by governmental authorities, as set forth in *Jacobson* and its progeny. Many courts across the country have cited this exception to individualized due process in the context of emergency health orders issued in response to this public health pandemic. *See, e.g.*, *910 E Main, LLC*, 2020 WL 4929256, at *10.

### B .   Plaintiffs Will Not Suffer Irreparable Injury Absent A Preliminary Injunction

Plaintiffs have the burden to prove that they will suffer irreparable injury if a preliminary injunction is not issued. "[T]he party seeking injunctive relief must show that the injury

complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman v. S. Salt Lake City,* 348 F.3d 1182, 1189 (10th Cir. 2003).

However, in its motion for preliminary injunction, Plaintiffs fail to meet this burden. They claim only that the current Public Health Order causes "substantial harm." (Doc 15, p. 23.) It is well settled that "simple economic loss usually does not, in and of itself, constitute irreparable harm." *Id.* Thus, Plaintiffs fail to meet their burden of demonstrating an imminent danger of irreparable harm.

Alternatively, Plaintiffs assert that any alleged deprivation of any constitutional right creates an irreparable harm. (Doc 15, p. 23.) Although Defendant acknowledges that the law can, in some circumstances, support the constitutional-violation-as-irreparable-injury principle, the Courts have generally reserved this status for "infringements of free speech, association, privacy or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." *Bayley's Campground Inc. v. Mills,* No. 2:20-cv-00176-LEW, 2020 WL 2791797, at *12 (D. Me. May 29, 2020) (*citing Pub. Serv. Co. of N. H. v. W. Newbury,* 835 F.2d 380, 382 (1st Cir. 1987). That is, although "some kinds of constitutional violations" presumptively cause irreparable harm, a procedural due process violation, alone, typically "does not automatically trigger a finding of irreparable harm." *Ezell v. Chicago,* 651 F.3d 684, 698 n.10 (7th Cir. 2011). Plaintiffs can demonstrate no clear and unequivocal deprivation of a property right.

Similarly, it is well-settled that where a plaintiff fails to show a likelihood of success on the merits of a claim that their constitutional rights were violated, a finding of irreparable harm is not warranted. *See McNeilly v. Land,* 684 F.3d 611, 621 (6th Cir. 2012) (affirming denial of preliminary injunction, noting that because the plaintiff "does not have a likelihood of success on

the merits . . . his argument that he is irreparably harmed by the deprivation of his First

Amendment rights also fails." *Id.*). As demonstrated above, Plaintiffs have not shown that the

temporary limitation on hours of operation during a pandemic violates any constitutionally

protected liberty or property right. No finding of irreparable harm is warranted on this basis.

Plaintiffs have not, and cannot, sustain their burden to show they will suffer irreparable

injury if the court does not enter a preliminary injunction enjoining the Health Order and,

therefore, Plaintiffs' request should be denied.

**C.      The Harm To Plaintiffs Does Not Outweigh The Harm To Douglas County And Its
         Citizens.**

The third element Plaintiffs must demonstrate in order to obtain a preliminary injunction

is that "the threatened injury to the movant outweighs the injury to the other party under the

preliminary injunction." *Heideman*, 348 F.3d at 1190. When making this determination, courts

consider what harmful secondary effects on the community will result from enjoining the

governmental order in effect. *Id.*

Applying this standard, courts across the country have found that the interest of

protecting the public from a known pandemic outweighs a temporary economic harm to the

plaintiff's businesses. *See*, *e.g.*, *Hartman*, 2020 WL 1932896, at *11 (holding that "the mitigating

measures in Director Acton's Stay at Home Order have helped to decrease the spread of the

virus. As a result of aggressive mitigation efforts, Ohio has fewer COVID-19 cases than

neighboring states with comparable populations . . . . If the Director's Order is enjoined, it is not

merely livelihoods, but lives that would be put at risk, and the State has an interest in public

health and the safety of its citizens." *Id.*) (*citing Neinast*, 346 F.3d at 594 (explaining that

"Courts consistently have upheld statutes primarily directed at preventing injury to an individual

on the basis of the impact upon the general public."), and *On Fire Christian Ctr., Inc. v. Fischer*,

No. 3:20-CV-264-JRW, 2020 WL 1820249, at *10 (W.D. Ky. Apr. 11, 2020) (explaining that "[i]n considering whether a TRO is in the public interest, a court must at the very least weigh the potential injury to the public health when it considers enjoining state officers from enforcing emergency public health laws.")); *TJM 64, Inc. v. Harris*, No. 2:20-cv-02498-JPM-tmp, 2020 WL 4352756, at *8 (W.D. Tenn. July 29, 2020) (explaining that "[e]njoining enforcement of the Health Department's COVID-19 Closure Orders would likely cause substantial harm to other members of the community and would not be in the public interest. Preventing Defendant from enforcing the Order would present a risk of serious public harm and foster the continued spread [of the] COVID-19 virus by allowing the Plaintiffs limited service restaurants to remain open."); *Bayley's Campground*, 2020 WL 2791797, at *13 (explaining that "Plaintiffs have not shown their hardships—exclusion from vacation property and loss of revenue—definitively outweigh the purported public health danger of lifting the quarantine restrictions . . ." *Id.*)

The severe health danger presented by COVID-19 does not appear to be in dispute, at least for the purposes of the Motion for Preliminary Injunction. Moreover, as set forth in Dr. Marcellino's Affidavit, attached hereto as Exhibit 1, COVID-19 presents a unique health challenge to communities worldwide due to its transmissibility and the serious health consequences that can arise from the disease. *See* Aff. of Dr. Marcellino, ¶ 4–7. COVID-19 is a respiratory disease that spreads easily from person to person and may result in serious illness or death. *See* Aff. of Dr. Marcellino, ¶ 5. The World Health Organization declared COVID-19 to constitute a pandemic on March 11, 2020. *See* Aff. of Dr. Marcellino, ¶ 4. This was quickly followed by the proclamation of a State of Disaster Emergency by Governor Kelly on March 12, 2020 and an emergency declaration by President Trump on March 13, 2020. *Id.*

As of October 13, 2020, Douglas County has had 2,642 total cases of COVID-19, of which 338 are currently active. *See* Aff. of Dan Partridge, ¶ 6, attached hereto as Exhibit 2. The positivity rate for COVID-19 is 5.4% and Douglas County has recorded 14 deaths associated with COVID-19. *Id.* As of the same date, LMH Health had 36% of its beds full, including 29% of its ICU beds, and 21% of its ventilators were in use. *Id.*

Alcohol consumption in social settings is correlated with increased risk of coronavirus spread. *See* Aff. of Dr. Marcellino, ¶ 11–16. Factors supporting this conclusion include that: face coverings are not compatible with drinking and thus are not worn consistently; patrons may be less cautious when drinking alcohol thus disregarding mask and social distancing guidance; patrons often yell or lean in toward one another to be heard above loud music, causing patrons to be in close proximity and to spread droplets; patrons often mingle with different groups; and late night patrons are usually present for social interaction. *See* Aff. of Dr. Marcellino, ¶ 13; Aff. of Partridge, ¶ 5. In short, it is clear that without community mitigation strategies, including the current Health Order, coronavirus will spread more rapidly, threatening to overwhelm Douglas County hospitals, and causing a greater number of deaths. *See* Aff. of Dr. Marcellino, ¶ 19.

The Public Health Officer has a compelling interest in maintaining Douglas County residents' health and safety. Plaintiffs may disagree with how Dr. Marcellino is protecting the community, but Dr. Marcellino—not Plaintiffs, and not this Court—are charged with assessing the risks and attempting to implement policies that best balance the costs and benefits of these difficult choices. *See Lawrence v. Colorado*, 455 F. Supp.3d 1063, 1075 (D. Colo. 2020) (explaining that "[the State's] choices may turn out to be wrong, in which case a lawsuit on the merits may succeed. But for purposes of a preliminary injunction, the possibility that those choices may yet be shown to be wrong is not enough. While compliance with the challenged

public Health Orders is painful for Mr. Lawrence and many others, he has not made a clear and unequivocal showing that the balance of harms tips in his favor, or that enjoining enforcement of the orders is in the public interest." *Id.*).

Finally, as in the irreparable harm analysis, district courts in the Tenth Circuit consider the likelihood of success when analyzing potential harm. *See Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1265 ("The threshold, and ultimately critical, flaw in the district court's [balance of equities] analysis is that it failed to take into account [the plaintiff's] likelihood of success on the merits of its unconstitutional conditions claim and the resulting likelihood of irreparable harm to [the plaintiff]." *Id.*); *see also Curtis v. Oliver*, No. CIV 20-0748-JB\JHR, 2020 WL 4734980, at *72 (D. N.M. Aug. 14, 2020). As set forth above, with Plaintiffs' limited likelihood of success, the balance of the equities favors the Defendant and his duty to protect Douglas County citizens.

The harm to Douglas County and the citizens it serves, in terms of sickness, death, dollars, and long term implications, far outweighs any monetary harm Plaintiffs may suffer as a result of the Public Health Order's limitations. As such, Plaintiffs' request for a preliminary injunction should be denied.

**D.     The Relief Requested Will Harm the Public Interest**

"The public interest factor requires this Court to inquire whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief." *Everett J. Prescott, Inc. v. Ross,* 383 F. Supp. 2d 180, 193 (D. Me. 2005). However, the final two factors—the balance of equities and the public interest—merge when the government opposes the issuance of a temporary restraining order, "because the government's interest is the public interest." *Zaya v. Adducci*, No. 20-10921, 2020 WL 1903172 (E.D. Mich.

Apr. 18, 2020) (quoting *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 512 (D.C. Cir. 2016)).

As stated above, Plaintiffs cannot prove that the public interest will not be harmed by the injunction. Indeed, the public has a great interest in allowing the Health Officer to exercise his official functions as provided by law. Permitting Plaintiffs to use injunctive relief to undermine the health and safety of the entire community should not be allowed. For these reasons, the Court should find that issuing a preliminary injunction would adversely affect the public interest. The court should deny Plaintiffs' request.

## IV.    Conclusion

As recently stated by the Federal District Court of Louisiana in upholding the complete closure of bars by regulatory authorities in response to COVID-19:

> the Court is compelled to conclude that [the ban] of on-site consumption of food or drinks at "bars" bears a "real or substantial relation" to the goal of slowing the spread of COVID-19 and is not "beyond all question" a violation of the bar owners' constitutional rights. It is a permissible public-health measure under *Jacobson* and *Abbott*, and the Court is denied the discretion to second-guess it.

*4 Acres Enters., LLC, v. Edwards*, No. 20-2150, 2020 WL 4747660, *15 (E.D. La., Aug. 17, 2020).

Likewise, in this case, given the potentially extreme consequences of failing to contain this virus, and the deference the Court is obligated to give to the governmental entities charged with containing this pandemic under *Jacobson* and its progeny, there can be no doubt that the harm caused by an erroneous injunction would be severe. In addition, Plaintiffs cannot satisfy any of the preconditions necessary to support a preliminary injunction. Plaintiffs fail to show that they will suffer irreparable harm, that any harm to them outweighs the harm to Douglas County or the citizens it serves, that a preliminary injunction would not cause harm to the public interest,

or that Plaintiffs' claims have a likelihood of success on the merits. For these reasons, the request for preliminary injunction should be denied.

**Respectfully Submitted,**

By: */s/ Bradley R. Finkeldei*
Bradley R. Finkeldei, #19470
John T. Bullock, KS #15119
Kate M. Simpson, KS #26453
**Stevens & Brand, LLP**
PO Box 189
900 Massachusetts Street, Suite 500
Lawrence, KS 66044
785-843-0811
785-843-0341 – Fax
BFinkeldei@stevensbrand.com
jbullock@stevensbrand.com
ksimpson@stevensbrand.com
*Attorneys for Thomas Marcellino, M.D..*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2020, I electronically filed the foregoing *Defendant Dr. Marcellino's Opposition to Plaintiffs' Request for a Preliminary Injunction* with the Clerk of the Court using the CM/ECF e-filing system, which will send notification of such filing to all participants receiving notices.

*/s/Bradley R. Finkeldei*
Bradley R. Finkeldei

## AFFIDAVIT OF DR. THOMAS MARCELLINO

STATE OF KANSAS       )
                              )ss:
COUNTY OF DOUGLAS   )

COMES NOW, Thomas Marcellino, being first duly sworn according to law and on my oath state as follows:

1.       My name is Thomas Marcellino, M.D.  I am over the age of eighteen years and I am fully competent in all respects to make this Affidavit.  I have personal knowledge of the facts stated herein and all such facts are true and correct.

2.       I am a board certified doctor having received my medical degree from the University of Kansas in 2005. I am board certified in family practice.  I completed a residency in family medicine at Via Christi, Wichita.  My internship was at Mayo Clinic in Arizona in 2006. I have been engaged full-time in the practice of medicine since 2005. As part of my ongoing training and education, I study matters related to public health, including disease and infection. I have completed a number of continuing medical education programs on these topics, along with others related to personal and public health.

3.       I have been appointed the Douglas County Health Officer by Lawrence-Douglas County Public Health pursuant to K.S.A. 65-201 *et seq.*

4.       On March 12, 2020, the Governor of the State of Kansas, Laura Kelly, found that a disaster had occurred, or the threat thereof was imminent within Douglas County, Kansas as a result of the Coronavirus pandemic (COVID-19) and the confirmed outbreak and person-to-person spread of COVID-19 in the United States, Kansas and Douglas County.  On March 13, 2020, President Trump also declared a state of emergency.

1

**Exhibit 1**

5.      COVID-19 is a respiratory disease that spreads easily from person to person and may result in serious illness or death.

6.      COVID-19 is a respiratory disease that spreads easily from person to person and may result in serious illness or death.

7.      To reduce spread of COVID-19, the United States Centers for Disease Control and Prevention (CDC) and the Kansas Department of Health and Environment (KDHE) recommend implementation of community mitigation strategies to increase containment of the virus, including closing of businesses/schools/entertainment, cancellation of large gatherings, social distancing in smaller gathering, and the wearing of masks when social distancing cannot be maintained.  Multiple studies have also shown that these community mitigation strategies have been very effective in reducing the risk of the spread of COVID-19.

8.      As the Local Health Officer, I believe community mitigation strategies are necessary due to the continued incidence and influx of new cases. These measures are necessary in order to address the community spread of the disease and to ensure the capacity of local resources is adequate to meet the increased need.

9.      As part of the ongoing and evolving community mitigation strategy, I issued the Local Health Order dated September 4, 2020 attached to the Petition as Exhibit A.

10.     I issued a subsequent Local Health Order date dated October 2, 2020 which replaced the September 4, 2020 order. That Order is attached to my affidavit as Exhibit 1.

11.     Since the beginning of the pandemic I have spent countless hours reviewing the latest information, studies, and data on COVID-19, its symptoms, its contagious nature, its impact on health, and effective community mitigation strategies to control its spread.

12.     I have also am involved on a daily basis in analyzing the COVID-19 data related specifically concerning Douglas County and studying the efficiency of community mitigation

2

strategies used to slow the spread of COVID-19. I also monitor the outbreaks in the community to understand the riskiest locations for our community. Further, I consult with other local expert infectious disease physicians to understand the impacts of the virus on the community.

13.     As it relates to establishments with liquor licenses, including bars and restaurants that function as equivalent to bars late at night, it is clear that the atmosphere in such locations, especially late at night, is conducive to the spread of COVID-19. In particular:

A.     The continuous drinking of beverages at an establishment requires the removal of masks, which increases the risk of infected respiratory droplets being transmitted among patrons. In addition, intoxicated persons are likely to experience impaired judgment and loosened inhibitions and thus wear masks less consistently.

B.     Loud music and noisy crowds can cause people to move closer to each other to hear and speak louder, which reduces the physical distance essential to preventing the spread of the COVID-19 virus and increases the risk of infected respiratory droplets being transmitted among patrons.

C.     Intoxicated patrons are more likely to speak louder, stand closer and interact with more people, all of which present the risks of close contact and spread of infected respiratory droplets.

D.     Patrons will often mingle with different groups rather than staying with the group with which they came.

E.     In Lawrence, Kansas, after midnight, the patrons of establishments with liquor licenses are more likely to be younger adults, who are more likely to be asymptomatic carriers of COVID-19, or have mild symptoms that they falsely attribute to another cause like allergies, and therefore are more likely to

3

patronize the establishments without realizing that they are spreading the virus.

F.    In my professional judgment, based upon my education, training, experience, and review of relevant resources, all of these factors contribute to a strong likelihood, if not certainty, of a disproportionately high risk of transmission of COVID-19 in establishments with liquor licenses operating after midnight.

14.    The White House Coronavirus Task Force and the CDC have released a study that adults with positive COVID-19 test results are more than 2.4 times likely to have gone to a bar or restaurant in the previous two weeks.  Likewise, when controlled for known exposure to a positive case, adults were 2.8 times more likely to report going to a restaurant and 3.9 times more likely to report going to a bar.

15.    The following are notable outbreaks associated with bars across the United States of which I am aware.  I am confident there are many other such outbreaks.

A.    East Lansing, Michigan: 185 cases linked to one bar/restaurant

B.    Vancouver, Washington: 18 cases, even with social distancing measures in place by the bar, including Plexiglas

C.    Baton Rouge, LA: 100 cases associated with Tigerland nightlife district

D.    Louisiana: ¼ of all cases associated with a bar or restaurant

E.    Spokane, WA: 25 cases following eating a restaurant that practiced all recommended prevention methods

F.    Kansas City, MO: 8 case outbreak causing the closure of Westport Ale House

16.    The following are notable outbreaks associated with "gentleman's clubs" across the United States of which I am aware.  I am confident there are many other such outbreaks.

A.    Portland, OR:  Outbreak occurred causing voluntary closure

4

B.    Tucson, AZ:  Two clubs with outbreaks causing closure

C.    Romulus, MI: 12 cases causing closure

D.    Toronto, Canada:  Outbreak exposing over 550 individuals

E.    Denver, CO:  Multiple cases in multiple clubs across Denver

F.    Miami, FL: Club shut down for multiple violations and cases

17.    The concern with carry-out alcohol is that bars and restaurants were using that process to work around the community mitigation strategies and it encouraged groups to continue to gather in a manner contrary to safety protocols.  That is, if alcohol sales are to cease at 11:00 p.m., but a bar could continue to sell carry-out alcohol, the bar could legally circumvent the order to cease the sale of alcohol.  So this measure brings consistency to the health order mandates.

18.    I have carefully considered the health orders I have issued.  As I have studied the data, including cases, positivity rate, location of outbreaks and the latest science, I have slowly reduced the limitations on establishments with liquor licenses, from complete closure, to requiring alcohol sales to cease at 9:00 p.m. with closure at 10:00 p.m., to the current order of ceasing alcohol sales at 11:00 p.m. with closure at midnight, 12:00 a.m.  I will continue to monitor the data, science, and habits of the public and adjust the orders as warranted.

19.    I believe that that without these public health orders in place, including the current order, the coronavirus will spread more rapidly, threatening to overwhelm the County's hospitals, and causing more incidence of infection, a greater number of deaths, and other adverse impacts on the community.

FURTHER AFFIANT SAYETH NOT.

(signature on next page)

5

Dr. Thomas Marcellino

Signed and sworn to before me on this ____14____ day of October, 2020 by Thomas

Marcellino.

Notary Public

My appointment Expires:

07/26/22

6

## <u>AFFIDAVIT OF DAN PARTRIDGE</u>

STATE OF KANSAS       )
                           )ss:
COUNTY OF DOUGLAS    )

       COMES NOW, Dan Partridge, being first duly sworn according to law and on my oath state as follows:

       1.      My name is Dan Partridge. I am over the age of eighteen years and I am fully competent in all respects to make this Affidavit. I have personal knowledge of the facts stated herein and all such facts are true and correct.

       2.      I am the Director of Lawrence Douglas County Public Health. I have a Bachelor of Science degrees in Fisheries Biology and Chemical Science (dual degree) and Milling Science and Management from Kansas State University. I obtained a master's degree with honors in public health from the University of Kansas School Of Medicine-Wichita in 2007, and was recognized as outstanding graduate for the 2006-2007 school year. I am also a 2004 graduate of the Kansas Public Health Leadership Institute and a 2002 graduate of the Kansas Public Management Center Public Health Certification program. In 2013, I served as the Kansas Association of Local Health Departments president, and in 2000 served as president of the Kansas Environmental Health Association.

       3.      Since the beginning of the pandemic, I have spent many hours reviewing the latest information, studies, and data on COVID-19, its symptoms, its contagious nature, its impact on health, and effective measures to control its spread.

       4.      I have also been involved on a daily basis in analyzing the COVID-19 data related specifically to Douglas County and studying the efficiency of community mitigation strategies used to slow the spread of COVID-19.

**Exhibit 2**

5.      There are several reasons why regulating establishments with liquor licenses, especially from midnight to 2:00 am, is important to containing the spread of COVID-19:

        A.      Patrons of establishments with liquor licenses, especially those present after midnight, are primarily there for social purposes, most often with individuals outside their immediate household.

        B.      These patrons are at the bar to drink alcohol, and thus are not likely to be wearing face coverings, or at least not consistently.

        C.      When music plays, or if it is loud, patrons tend to move closer to each other and talk louder reducing physical distancing.

        D.      Drinking alcohol also tends to decrease inhibitions and may cause people to move closer and disregard safety protocols, including social distancing and mask wearing.

6.      As of October 13, 2020, Douglas County has

        A.      2,642 total cases of COVID-19

        B.      338 of the total cases are currently active.

        C.      The positivity rate for COVID -19 in Douglas County is 5.4%.

        D.      Douglas County has had 14 deaths associated with COVID-19.

        E.      At LMH, 36% of the beds, and 29% of the ICU beds were in use.

        F.      21% of the ventilators at LMH were in use.

7.      The following outbreaks have occurred in Douglas County.  An outbreak is defined as two or more cases with the same source of transmission and are not within the same household.

          June :          5 total (1 bar/restaurant)
          July:           11 total (3 bar/restaurant)

| August: | 12 total (3 bar/restaurant) |
| September: | 33 total (5 bar/restaurant)* |
| October: | 2 total (2 bar/restaurant) (through October 13, 2020) |

\* For context, half (16) of September's outbreaks were either officially KU students (Greek House, residence hall) or unofficially KU students (Greek House party).

8.    In addition to official outbreaks, this community has had 9 additional situations where a restaurant or bar had more than one case connected to it.  Overall, we have had 32 reported exposures at bars and restaurants.

9.    My staff visited the Paradise Saloon at 10:25 pm on September 25, 2020, and Paradise Saloon was operating beyond the required closure time of 10:00 p.m.  A first violation/warning letter was sent on September 28, 2020.

10.    I believe that without these public health orders in place, including the current order, the coronavirus will spread more rapidly, threatening to overwhelm the County's hospitals, and causing greater incidence of infection, a greater number of deaths, and other harmful impacts to our community.

FURTHER AFFIANT SAYETH NOT.

Dan Partridge

Signed and sworn to before me on this ___14ᵗʰ___ day of October, 2020 by Dan Partridge.

Notary Public

My appointment Expires:

11/08/21

NOTARY PUBLIC
STATE OF KANSAS
ELSABETH KNACKSTEDT
My Appointment Expires 11/08/21